IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
CARLA MALONE STECK, )
 Respondent, )
 )
v. ) WD83568
 )
MISSOURI DEPARTMENT OF ) FILED: April 13, 2021
NATURAL RESOURCES AND )
MISSOURI CLEAN WATER )
COMMISSION, )
 Appellants. )
 Appeal from the Circuit Court of Cole County
 The Honorable Daniel R. Green, Judge
 Before Division One: Alok Ahuja, P.J., and
 Thomas H. Newton and Thomas N. Chapman, JJ.
 In 2016, Carla Steck sought approval from the Department of Natural

Resources for an in-ground septic system which would treat and dispose of

wastewater from both a residential property and an adjacent parcel of commercial
property (a so-called “cluster” system). The Department approved the wastewater

treatment system, but on conditions which Steck found unacceptable. Steck

pursued an administrative appeal. After a hearing, the Administrative Hearing

Commission (the “AHC”) issued a decision recommending that the Clean Water

Commission sustain the Department’s approval of the cluster wastewater treatment

system. The Clean Water Commission unanimously adopted the AHC’s

recommendation.

 Steck then petitioned for judicial review in the Circuit Court of Cole County.
The circuit court reversed the Commission’s decision. It held that the Department
of Natural Resources did not have regulatory authority to approve a wastewater

treatment system in this case, and that the Clean Water Commission unlawfully

considered new, extra-record evidence when it reviewed the AHC’s recommended

decision. The Department appeals. We reverse the circuit court’s judgment, and

affirm the decision of the Clean Water Commission sustaining the Department of

Natural Resources’ conditional approval of Steck’s proposed wastewater treatment

system.

 Factual Background
 On December 22, 2000, Carla Steck (along with her husband Charles)

submitted a request to the Department of Natural Resources for approval of on-site

wastewater treatment systems in a proposed residential development, Beverly’s

Hill, in Jefferson City. The Stecks planned a residential housing development

consisting of 32.3 acres, to be divided into twelve individual lots. Each lot would

employ an on-site wastewater treatment system, also known as a septic system.

 The 2000 application included a geohydrologic evaluation (prepared by the

Department’s Division of Geology and Land Survey), a soils report (completed by a

soil scientist retained by the Stecks), and a proposed plat map for the development.

The geohydrologic evaluation concluded that a minimum lot size of 2.2 acres would

be required, based on “the potential impact of absorption-field effluent on

groundwater.” In comparison, the soils evaluation report concluded that a

minimum lot size ranging from 0.92 to 2 acres would be sufficient to support

individual wastewater treatment systems for the lots in the development.

 Under 10 CSR 20-6.030(7)(A), the applicable minimum lot size is “the larger

of the values calculated” in the geohydrologic evaluation and in the soils report,

meaning that the 2.2-acre minimum lot size recommended by the geohydrologic

evaluation would be controlling. The proposed plat map attached to the Stecks’

 2
request for approval divided Beverly’s Hill into twelve lots, each equal to or greater

than 2.2 acres.

 On December 28, 2000, the Department approved the use of individual septic

systems for each of the twelve lots in the Beverly’s Hill subdivision. The

Department’s approval letter noted that Beverly’s Hill would consist of a “thirty-two

(32) acre tract . . . divided into twelve (12) lots, all of which are 2.2 acres and larger

in size.” The Department conditioned its approval as follows:

 1. The effluent from the on-site wastewater system shall be
 contained on the lot and handled in such a manner that there is no
 violation of the Missouri Clean Water Law and Regulations.
 2. Residences are intended for single family residences and
 only one (1) shall be constructed on each lot.
 3. No lot may be reduced in size by more than 10% without
 prior approval of the Department of Natural Resources.
 On December 6, 2016, Steck submitted a new request for approval of a

wastewater treatment system to the Department. Steck’s 2016 request concerned a

single lot within the Beverly’s Hill subdivision, Lot 1, which Steck still owned.

Steck proposed to subdivide Lot 1 in the existing development into two lots: Lot 1-

A, a one-acre lot that would remain within the Beverly’s Hill subdivision, and which

Steck would deed to her son; and Lot A-1, consisting of approximately 1.2 acres,
which would be joined to a commercial parcel of 0.11 acres which was located

adjacent to, but outside of, Beverly’s Hill. The application indicated that Steck’s son

would build a two-bedroom, two-bathroom, single-family home on Lot 1-A. A barn

was located on Lot A-1, which Steck used as an art studio; the barn had one non-

public bathroom. Steck sought Department approval of a “cluster” system for

wastewater treatment that would service both lots, and for which the owners of

both lots would share ownership and responsibility. Steck proposed that this
cluster system would be located entirely on the one-acre Lot 1-A.

 3
 The 2016 request included a new geohydrologic evaluation, a soils report, and

a proposed re-platting which reconfigured Lot 1 and the commercial parcel outside

Beverly’s Hill into Lots 1-A and A-1. The 2016 geohydrologic evaluation was

consistent with the findings of the geohydrologic report completed in 2000, although

the 2016 evaluation did not itself establish a minimum lot size.

 On June 12, 2017, the Department issued its final approval of a cluster

wastewater treatment system to serve Lots 1-A and A-1.1 The approval letter noted

that a soil study indicated that “the size of Lot 1-A could potentially be one acre.”

The letter continued:

 However, per 10 CSR 20-6.030(7)(A), the minimum lot size will be the
 larger of the value calculated in the geohydrologic evaluation if
 required or the soils report. In [a geohydrologic evaluation] dated
 October 30, 2000, the minimum lot size was established at 2.2 acres.
 In comparison of the findings of that report and a [geohydrologic
 evaluation] dated December 12, 2016, the local hydrologic and geologic
 characteristics are identical to that of the October 30, 2000 rating.
 Given the geohydrologic information has not changed, the rating sheet
 from October 30, 2000, remains valid . . . .
 The Department’s June 12 letter approved the subdivision of Beverly’s Hill

Lot 1. It also approved construction of a cluster wastewater treatment system that

would service both the single-family residence on Lot 1-A, and the barn/art studio
on Lot A-1, with responsibility for the system to be shared by the present and future

owners of the two lots. The Department’s approval letter required, however, that

the acreage of both lots be used for dispersal of wastewater from the septic system.

 Charles Harwood is a soil scientist in the Department of Natural Resources

who reviewed Steck’s 2016 application. Harwood testified that, based on the

 1 The Department issued earlier approval letters on January 4, 2017, and on
March 17, 2017. The Department’s June 12 letter states that it was issued as a result of
Steck’s request for the Department to “re-evaluate soils and geological information” that
had since been received, and to “clarify or revise” the conditions of the Department’s
approval.

 4
geohydrologic evaluation, it would not be safe for the environment to have a septic

system located solely on Lot 1-A, which serviced both Lot 1-A and Lot A-1.

Harwood testified, however, that the system would be acceptable if it took

advantage of the entire acreage of the two combined parcels, by locating lateral

lines which would disperse effluent on both lots. In his testimony, Harwood

recognized that Lot A-1 was not itself subject to Department regulation. He

testified, however, that “a septic system for the 1 acre Lot 1-A,” standing alone,

“would not be approvable,” and that the Department “had to look a little bit outside

the box to help get this approved.”

 On June 21, 2017, Steck sought administrative review of the conditions of the

Department’s approval pursuant to 10 CSR 20-6.030(7)(E). In accordance with

§§ 621.250 and 640.013,2 the Administrative Hearing Commission proceeded with

contested case review of Steck’s appeal. The AHC held an evidentiary hearing on

August 25, 2017. On October 13, 2017, the AHC issued its decision recommending

that the Clean Water Commission sustain the Department’s June 12 approval

letter.

 The Clean Water Commission considered the AHC’s recommended decision at

a public meeting on April 4, 2018. During that meeting the Commission questioned
not only counsel for the Department and for Steck, but also questioned Steck and

Harwood directly. At the conclusion of the meeting, the Clean Water Commission

voted unanimously to adopt the AHC’s recommended decision without changes.

 Steck sought judicial review of the Clean Water Commission’s decision in the

Circuit Court of Cole County, pursuant to §§ 536.100 to 536.140.3 The circuit court

 2 Statutory citations refer to the 2016 edition of the Revised Statutes of
Missouri, updated through the 2020 Cumulative Supplement.
 3 Pursuant to § 644.071.1, “[a]ll final orders or determinations of the
commission or the director made pursuant to the provisions of sections 644.006 to 644.141
are subject to judicial review pursuant to the provisions of chapter 536,” with an exception

 5
reversed the Clean Water Commission’s decision, finding that the Department

lacked regulatory authority over Steck’s construction of the cluster wastewater

treatment system, and that the Commission had improperly considered new

evidence during the meeting at which it considered the AHC’s recommended

decision.

 The Department appeals.

 Standard of Review
 On appeal following the circuit court’s reversal of an agency decision, we

“review[ ] the agency’s decision rather than the judgment of the circuit court.”

Danna v. Mo. Dep’t of Soc. Servs., Family Support Div., 449 S.W.3d 821, 823 (Mo.

App. W.D. 2014) (citation omitted). “[T]he party aggrieved by the agency decision

has the duty to file the appellant’s brief and bears the burden of persuasion before

this court.” Guthrie v. Mo. Dep’t of Labor & Indus. Relations, 503 S.W.3d 261, 265

(Mo. App. W.D. 2016) (citing Rule 84.05(e); other citation omitted); see also Versatile

Mgmt. Grp. v. Finke, 252 S.W.3d 227, 232 (Mo. App. E.D. 2008).

 Our review is limited to determining whether the [commission]’s
 actions: (1) violates a constitutional provision; (2) exceeds the
 [commission]’s statutory authority or jurisdiction; (3) is unsupported
 by competent and substantial evidence upon the whole record; (4) is
 unauthorized by law; (5) is made upon unlawful procedure or without a
 fair trial; (6) is arbitrary, capricious, or unreasonable; or (7) involves
 an abuse of discretion. § 536.140.2.
Countryclub Homes, LLC v. Mo. Dep’t of Nat. Res., 591 S.W.3d 882, 887 (Mo. App.

W.D. 2019). “We defer to the [agency]’s findings of fact so long as they are

supported by competent and substantial evidence” and “[w]e review questions of law

de novo.” Id. (citations omitted). The commission’s “decision is presumed valid, and

not relevant here. Because this proceeding does not involve the Clean Water Commission’s
approval or denial of a construction or operating permit, the special judicial review
provision found in § 644.051.6 is inapplicable.

 6
the burden is on the party attacking it to overcome that presumption.” Id. at 887-88

(citation and internal quotation marks omitted).

 Discussion
 Although she prevailed before the circuit court, pursuant to Rule 84.05(e)

Steck is treated as the appellant in this Court. She raises two Points on appeal.

First, Steck argues that the Clean Water Commission violated the statute

governing its review of the AHC’s recommended decision when it “hear[d] and

consider[ed] testimony and evidence taken outside the Administrative Hearing

Commission” record. Second, Steck argues that the Department “had no lawful

authority” to approve the method of wastewater treatment for the property at issue.

 I.
 In Point I, Steck argues that the Clean Water Commission exceeded its

statutory authority by considering testimony outside the record created before the

Administrative Hearing Commission.

 Section 621.250.1 transfers “[a]ll authority to hear contested case

administrative appeals granted . . . [to] the clean water commission” to the

Administrative Hearing Commission (or “AHC”). The Clean Water Commission,

however, retains “[t]he authority to render final decisions after hearing on appeals
heard by the administrative hearing commission.” Id. Section 621.250.3 requires

that the Clean Water Commission’s final decision “be based only on the facts and

evidence in the hearing record” created before the AHC.

 The Clean Water Commission considered the AHC’s recommended decision at

its regular business meeting on April 4, 2018. At that meeting, the Commission

gave counsel for the Department and for Steck the opportunity to present argument

and answer questions from Commissioners. The Commission also heard from, and

asked questions of, both Steck and the Department’s soil scientist Charles Harwood,
who reviewed Steck’s 2016 application.

 7
 Steck argues that the public meeting before the Commission “became an

opportunity for [the Department], through its attorney and its primary witness, to

testify regarding the facts and law in the case – to essentially correct and

supplement the AHC record to plug holes and satisfy the commission members’

concerns and unanswered questions regarding the decision.” Steck argues that,

under § 621.250, the “exclusive power” to conduct an evidentiary hearing in this

matter rested with the AHC, not the Clean Water Commission, and that the

Commission was required to base its decision only on the evidence in the record

developed before the AHC.

 In a proceeding governed by § 621.250, it is unusual, and likely inadvisable,

for the Commission to permit non-lawyer fact witnesses to speak (unless they are

unrepresented parties). Section 621.250.3 limits the Commission to the evidentiary

record developed before the AHC. Proceedings before the Commission should be

limited to argument concerning the weight and credibility of the evidence presented

to the AHC, and the legal effect of that evidence. If fact issues were not adequately

addressed in the AHC proceeding, the Commission should decide only the legal

consequences of such an evidentiary gap – it should not attempt to fill that gap by

hearing further testimony or receiving further evidence. Permitting fact witnesses
to speak, and to answer Commissioners’ questions, at hearings governed by

§ 621.250.3 runs the risk of introducing improper extra-record evidence into the

decision-making process.

 Steck has failed to establish grounds for reversal in this case, however. The

Commission’s chairperson emphasized more than once during the Commission

meeting that the Commission was confined to considering the evidence submitted

during the AHC hearing. Steck has not identified any particular fact, or piece of

evidence, that was introduced during the Commission meeting, that was not
already present in the record before the AHC. In particular, Charles Harwood’s

 8
statements to the Commission appear to merely summarize some of the facts to

which he testified at much greater length during the AHC proceeding. The eight-

and-a-half minutes during which Harwood addressed the Clean Water Commission

stands in sharp contrast to the nearly one hundred pages of transcribed testimony

he gave during the AHC proceeding.

 The only “new fact” which appears to have been addressed during the Clean

Water Commission hearing was Steck’s claim that, subsequent to the AHC hearing,

Cole County authorities had approved the construction of a cluster septic system

located wholly on the one-acre Lot 1-A – apparently contrary to the Department’s

June 12, 2017 approval letter. But members of the Commission, and the

Department’s counsel, both emphasized that any actions taken by Cole County

subsequent to the AHC hearing were not in the record, and were irrelevant to the

issue to be decided by the Clean Water Commission anyway.

 It is also significant that the Commission adopted the AHC’s recommended

decision without modification. In Countryclub Homes, LLC v. Missouri Department

of Natural Resources, 591 S.W.3d 883 (Mo. App. W.D. 2019), parties who applied for

a permit for a concentrated animal feeding operation (“CAFO”) challenged the

Clean Water Commission’s denial of their permit application. They argued that the
Commission’s decision should be reversed because a Commissioner had considered

information outside the AHC record by personally visiting the proposed CAFO site.

We rejected this argument, reasoning that

 Commissioner Reece voted to approve the AHC’s recommended
 decisions in both cases in their entirety and without any modifications.
 [Petitioners] do[ ] not specify anything in the AHC’s recommended
 decisions . . . that was based upon facts or evidence outside the record.
 Thus, despite Commissioner Reece’s comments during the hearing
 [concerning his visit to the proposed CAFO site], it appears that his
 final decisions were based only on the facts and evidence in the
 hearing record, as Section 621.250.3 required. [Petitioners] ha[ve] not

 9
 met [their] burden of demonstrating that Commissioner Reece violated
 Section 621.250.3.
Id. at 894 (footnote omitted).

 The same is true here. The Clean Water Commission voted to approve and

adopt the Administrative Hearing Commission’s recommended decision in its

entirety, without any change or modification. Steck does not contend that the

AHC’s recommended decision, which the Commission adopted in toto, was itself

based on extra-record evidence. The Clean Water Commission’s final decision was

not improperly based on facts or evidence from outside the AHC hearing record.

 Point I is denied.

 II.
 In her second Point, Steck argues that the Department did not have

regulatory authority to approve her subdivision of Beverly’s Hill Lot 1, or the

cluster wastewater treatment system for Lots 1-A and A-1.

 Steck’s argues that her proposed subdivision of Lot 1 in the Beverly’s Hill

development did not itself constitute a “residential housing development,” and

therefore did not implicate the Department’s regulatory authority. The relevant

regulation, 10 CSR 20-6.030(1)(D), provides that,

 [u]nless exempted in this rule, the developer of any residential housing
 development shall obtain approval from the department for the method
 of sewage treatment and disposal to be used in the development prior
 to the sale or lease of any lot, or the commencement of construction on
 any lot by the developer or any person.
A “residential housing development” means: “Any land which is divided or proposed

to be divided into three (3) or more lots, whether contiguous or not, for the purpose

of sale or lease as part of a common promotional plan.” 10 CSR 20-6.030(1)(A)(6).

 Steck does not dispute that her establishment of the Beverly’s Hill

subdivision in 2000 constituted a “residential housing development” which required
Department approval before on-site wastewater treatment systems could be

 10
implemented. Rather, Steck argues that her further subdivision of a single lot in

2016 did not itself constitute a “residential housing development” subject to 10 CSR

20-6.030. She also argues that the Department had no authority to regulate the

manner of wastewater treatment for the commercial parcel, Lot A-1, which was

located outside of the Beverly’s Hill residential development.

 Steck’s arguments miss the mark. The reason she was required to obtain

Department approval for her subdivision of Lot 1, and for her plan to operate a

septic system on Lot 1-A, was because the entire Beverly’s Hill development was

subject to the conditions imposed by the Department when it approved on-site

wastewater treatment in the subdivision in 2000. In 2016, Steck was seeking to

modify, or obtain an exemption from, the conditions the Department had imposed

on the entire Beverly’s Hill development (including Lot 1) in 2000. The

Department’s regulatory authority was triggered by Steck’s request for relief from

the conditions the Department had lawfully imposed on her development in 2000.

 The Department’s December 28, 2000 approval letter made clear that further

Department approval would be required for material deviations from the conditions

specified in the approval letter. The letter noted that each of the lots in the planned

Beverly’s Hill subdivision was “2.2 acres and larger in size,” and specified that “[n]o
lot may be reduced in size by more than 10% without prior approval of the

Department of Natural Resources.” The requirement for Department approval of

any material reduction in the size of the lots is consistent with 10 CSR 20-

6.030(7)(C), which provides that:

 there shall be no deviation or change that may adversely affect the
 geohydrologic evaluation, lot sizes, number of lots or the proposed
 water supply for a residential housing development following
 departmental approval without first securing written approval of the
 proposed changes from the department.

 11
 While the Department may not have had original regulatory authority over

Steck’s proposed subdivision of Lot 1 in 2016, the Department had continuing

authority over her request to modify the conditions imposed on the lots in Beverly’s

Hill in the Department’s 2000 approval letter.

 Steck emphasizes that, by its own admission, the Department has no

independent regulatory authority over her commercial property. She therefore

argues that the Department had no authority to impose conditions on the

wastewater treatment system servicing Lot A-1. Steck’s argument ignores,

however, that she proposed to create Lot A-1 by reducing the size of Beverly’s Hill

Lot 1 by more than 10% – a reduction in size which triggered the Department’s

regulatory authority. Steck’s argument also ignores that she proposed to dispose of

wastewater generated on Lot A-1 in a wastewater treatment system located wholly

within the Beverly’s Hill subdivision. Thus, while all or part of Lot A-1 may have

itself been outside the Department’s regulatory power, the method of wastewater

treatment Steck proposed for the lot plainly implicated the Department’s regulatory

authority over the residential development itself.

 Finally, Steck cites to 10 CSR 20-6.030(1)(C)(5), which exempts “[r]esidential

housing developments located in areas where the department has determined that
the local administrative authority has a local program sufficient to meet the goals of

this rule.” Steck asserts in her Brief that this exemption applies here because “Cole

County became an Ordinance County in 2014.” There is nothing in the record on

appeal, however, to indicate that Cole County has adopted a program of regulation

of wastewater treatment systems in residential developments sufficient to meet the

goals of 10 CSR 20-6.030, or – equally important – that the Department has

determined that any such regulatory program is sufficient to meet the rule’s goals.

Steck’s Brief cites a short exchange from Harwood’s AHC testimony, in which he
explained that the Cole County Health Department had authority to issue permits

 12
which approved of the specific design of the wastewater treatment systems in

Beverly’s Hill. Harwood did not testify, however, that Cole County would itself

evaluate the potential environmental impacts of this method of wastewater

treatment, given the soil characteristics and geohydrology of the Beverly’s Hill

property. Steck’s argument that the Department’s regulatory authority was

displaced by Cole County is without merit.

 Point II is denied.

 Conclusion
 The judgment of the circuit court is reversed. We affirm the decision of the

Clean Water Commission, which adopted the Administrative Hearing Commission’s

recommendation to sustain the Department’s June 12, 2017 approval letter.

 Alok Ahuja, Judge
All concur.

 13